J-S19022-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| DONALD JAMES STONE, | |
| Appellee | No. 1657 MDA 2016 |

Appeal from the Order Entered September 13, 2016
In the Court of Common Pleas of Lycoming County
Criminal Division at No(s): CP-41-CR-0001762-2015

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED MAY 30, 2017**

The Commonwealth appeals from the trial court's order partially granting Appellee's, Donald James Stone (hereinafter "Stone"), motion to suppress oral and written statements he made to a prison official.  The Commonwealth contends the statements in question were admissible because they were voluntarily given and were not the product of a coercive custodial interrogation, despite the Commonwealth's concessions that Appellee was not given **Miranda**[1] warnings beforehand, and that the statements occurred during a custodial detention.  After careful review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] **Miranda v. Arizona**, 384 U.S. 436 (1966).

The trial court summarized the relevant facts in this case as follows:

[Stone] is charged with Institutional Sexual Assault, Indecent Assault, Harassment[,] and Official Oppression. On June 3, 2015, [Stone], a physician employed by a third party contractor at S.C.I. Muncy (Muncy), was interviewed by Security Captain Shawn Waltman (Waltman) of Muncy and Trooper James Wool (Wool) of the Pennsylvania State Police (PSP) regarding a Prison Rape Elimination Act (PREA) allegation made by an inmate/patient. [Stone] g[a]ve a written statement to Waltman and once Wool arrived at Muncy, gave written consent to search his vehicle. Wool's search discovered a notebook that had been used by both [Stone] and the alleged victim.

### A. Testimony of Captain Shawn Waltman

[The] Commonwealth's first witness was Waltman. On June 3, 2015, Waltman asked [Stone]'s supervisor to bring [Stone] to the security office to make a Staff Statement regarding a PREA allegation. Waltman testified [that Stone] was brought to the security office in the early afternoon. Waltman contacted the PSP after he received the report of the allegation[,] stating "that's part of the procedures when we receive an allegation that the PSP is notified as well as our Office of Special Investigation." Waltman testified that he had not been trained in the proper use of *Miranda* warnings. He also explained the reason [Stone] was escorted from the infirmary to the security office for his interview was "to make sure there was no chance they [alleged victim and alleged perpetrator] crossed paths."

Waltman interviewed [Stone] in the security office of Muncy. He told [him] the reason for the investigation and advised him that if he left the interview before its completion he would not be complying with the investigation. Waltman indicated that normally someone who is an employee of the State would be subject to disciplinary action up to and including termination if he or she did not comply with an investigation[,] but since [Stone] was a contract physician that rule would not apply to him.

Waltman testified that Wool ultimately responded to Muncy. When Wool was in the parking lot searching [Stone]'s car, [Stone] asked to add information to his written statement;

Waltman stated that page 4 of the statement was the information added after Wool arrived at Muncy. Waltman testified that [Stone] was escorted from the building and asked to return the badge that allowed him access to the institution at 4:15 PM.

### B. Testimony of Trooper James Wool, Pennsylvania State Police

On June 3, 2015, at noon, Wool was contacted by Corporal Joseph Akers of the Pennsylvania State Police Montoursville, Criminal Investigation Unit. Wool was advised that Waltman contacted the PSP to report an alleged sexual assault that took place with a prison physician and an inmate. When Wool arrived at Muncy he was met by Waltman in the parking lot who briefed him on the situation. In Waltman's office he was told "[Stone] wasn't allowed to leave the area until they allowed him to do so. [Stone] wouldn't be allowed to go to his office or his vehicle for any reason."

When Wool went into the interview room, Waltman explained to [Stone] "the reason why he was being held there. He told him that he wasn't allowed to go to his office or leave until they allowed him to." Wool confirmed on cross examination that it was his understanding that [Stone] was not permitted out of the institution until Waltman released him.

Wool testified that he interviewed [Stone] for about an hour. The interview commenced at approximately 1:15 P.M. He testified that there was a break in the interview while he searched [Stone]'s vehicle, after [he] signed a PSP waiver of rights and consent to search form, submitted as Commonwealth's Exhibit 2. Wool testified that it was a form to "conduct a search of … Stone's office and also his vehicle located at S.C.I. Muncy." Wool testified that he did not [read **Miranda** warnings to Stone] because he was not in custody. Wool told [him] that "he was not under arrest....he was probably going to go home today, more than likely to go home." He also testified that [Stone] did say that if he was going to be accused of sexual assault that he wanted an attorney.

Trial Court Suppression Opinion and Order (TCSO), 9/13/16, at 1-4 (footnotes and citations to the record omitted).

The Commonwealth ultimately charged Stone with the above-listed offenses in a criminal information filed on October 30, 2015. Stone filed a supplemental omnibus pre-trial motion on January 4, 2016, in which he asserted, *inter alia*, that his verbal and written statements provided to Waltman and Wool should be suppressed because he made them during a custodial detention without having been read **Miranda** warnings. Supplemental Pre-Trial Motion, 1/4/16, at ¶¶ 29-33 (unnumbered pages). A suppression hearing was held on April 25, 2016, at which Waltman and Wool testified. Stone filed a brief in support of suppression on May 9, 2016, and the Commonwealth filed its response on May 18, 2016. Stone also filed a response to the Commonwealth's brief on May 25, 2016.

On September 13, 2016, the trial court issued an opinion and order granting in part, and denying in part, Stone's suppression motion. Specifically, the court suppressed Stone's "statements, oral and written, made after Wool's arrival at S.C.I. Muncy…." TCSO at 7.[2] The Commonwealth filed a motion for reconsideration of the suppression order

_____

[2] The trial court also ordered suppression of the notebook discovered in Stone's car, having determined that Stone's consent to that search was involuntary. The Commonwealth has not preserved on appeal any claim pertaining to that aspect of the trial court's suppression order. Moreover, although Stone maintains that the trial court should have also suppressed the statements he made prior to Wool's arrival, Stone has not cross-appealed in this case. Accordingly, our review in this matter is limited to the portion of the suppression order pertaining to the oral and written statements made by Stone after Wool's arrival.

on September 20, 2016, and Stone filed an answer thereto on September 28, 2016. On September 29, 2016, the trial court issued an order denying reconsideration.

The Commonwealth filed a timely notice of appeal on October 4, 2016, and a timely, court-ordered Pa.R.A.P. 1925(b) statement on October 17, 2016. The trial court issued an order on October 25, 2016, indicating that it was relying on its September 13, 2016 Opinion and order in lieu of issuing a Rule 1925(a) opinion.

The Commonwealth now presents the following question for our review: Whether the trial court abused its discretion by granting suppression of statements made by [Stone] to … Waltman at a time when [Stone] was not being interrogated[?]" Commonwealth's Brief at 8.

> Our standard of review in addressing a challenge to the suppression court's granting of a suppression motion is well settled.
>
> > When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.
>
> ***Commonwealth v. Miller***, 56 A.3d 1276, 1278–1279 (Pa. Super. 2012) (citations omitted). "Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions."

> ***Commonwealth v. Brown***, 606 Pa. 198, 996 A.2d 473, 476 (2010) (citation omitted).

***Commonwealth v. Korn***, 139 A.3d 249, 252–53 (Pa. Super. 2016).

> In ***Miranda***, the Supreme Court of the United States held that:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

***Miranda***, 384 U.S. at 444–45 (footnote omitted).

> Moreover,

> [s]tatements made during custodial interrogation are presumptively involuntary, unless the accused is first advised of her ***Miranda*** rights. ***Commonwealth v. DiStefano***, 782 A.2d 574, 579 (Pa. Super. 2001)…. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her]

freedom of action in any significant way." ***Miranda***, ***supra*** at 444…. "[T]he ***Miranda*** safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." ***Commonwealth v. Gaul***, 590 Pa. 175, 180, 912 A.2d 252, 255 (2006)…. Thus, "[i]nterrogation occurs where the police should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect." ***Commonwealth v. Ingram***, 814 A.2d 264, 271 (Pa. Super. 2002)…. "[I]n evaluating whether ***Miranda*** warnings were necessary, a court must consider the totality of the circumstances. In conducting the inquiry, we must also keep in mind that not every statement made by an individual during a police encounter amounts to an interrogation. Volunteered or spontaneous utterances by an individual are admissible even without ***Miranda*** warnings." ***Gaul***, ***supra***.

***Commonwealth v. Williams***, 941 A.2d 14, 30 (Pa. Super. 2008).

For purposes of this appeal, it is uncontested by the Commonwealth that: 1) Stone was 'in custody' for ***Miranda*** purposes; 2) he was not read ***Miranda*** warnings prior to giving the suppressed statements; and 3) he did not execute any waiver of his ***Miranda*** rights. Nevertheless, the Commonwealth contends that the suppressed statement were not "the fruits of [a] custodial interrogation." Commonwealth's Brief at 12. Thus, the Commonwealth contends that despite being in custody, and having been subject to an earlier custodial interrogation by Wool, Stone freely volunteered the suppressed statements to Waltman while Wool was searching Stone's car for the notebook. In making this argument, the Commonwealth relies exclusively on two cases, ***Commonwealth v. Yount***, 314 A.2d 242 (Pa. 1974), and ***Commonwealth v. Myers***, 392 A.2d 685

- 7 -

(Pa. 1978). Although neither of those cases are directly on point,[3] we will address each in turn.

The pertinent facts in *Yount* were as follows:

> On April 28, 1966, the body of Pamela Sue Rimer, an eighteen year-old high school student, was discovered in a wooded area near her home in Luthersburg, Pennsylvania. One of her stockings was knotted and tied around her neck. An autopsy revealed that death was caused by strangulation. Further examination disclosed three slashes across the victim's throat and cuts of the fingers of her left hand, inflicted by a sharp instrument, and numerous wounds about her head, caused by a blunt instrument.

> At approximately 5:45 a.m. on the morning of April 29, 1966, [Yount], a teacher at the school the deceased had attended, voluntarily appeared at the state police substation in DuBois, Pennsylvania, and rang the doorbell. An officer opened the door and asked whether he could be of assistance. [Yount] stated, 'I am the man you are looking for.' The officer asked whether he was referring to the 'incident in Luthersburg,' and [Yount] responded in the affirmative.

> The officer then asked [Yount] to come into the police station and be seated. Leaving [him] unattended, the officer proceeded to a back bedroom where a detective and another police officer were sleeping, woke them, and informed them that 'there was a man in the front that said we are looking for him.' He then returned to the front office where [Yount], who had removed his coat, hat, and gloves, identified himself as Jon Yount.

> After dressing, the detective and the second officer entered the front office. The detective was told by the first

---

[3] Specifically, neither *Yount* nor *Myers* directly address the core issue at the heart of the Commonwealth's argument: whether Stone's response to an immediately preceding custodial interrogation was so temporally displaced from that interrogation that it constituted a spontaneous, volunteered utterance unprotected by *Miranda*.

- 8 -

officer that [the man]'s name was Jon Yount. The detective then asked [Yount] to be seated inside a smaller office adjacent to the front office, where he asked, 'Why are we looking for you?' [Yount] replied, 'I killed that girl.' Upon hearing that answer, the detective inquired, 'What girl?', and [Yount] responded, 'Pamela Rimer.'

In response to the detective's next question, 'How did you kill this girl?', [Yount] answered, 'I hit her with a wrench and I choked her.' At that point the detective gave [Yount] admittedly inadequate **Miranda** warnings, and began interrogation as to the details of the crime. A written confession was subsequently obtained.

**Yount**, 314 A.2d at 244–45.

Yount was initially convicted of rape and first degree murder, but was then granted a new trial on appeal when our Supreme Court determined that Yount's inculpatory answers (including his subsequent confession) to the detective's question, "How did you kill this girl?," should have been suppressed under the authority of **Miranda**. **See Commonwealth v. Yount**, 256 A.2d 464, 466 (Pa. 1969). During Yount's second trial, he argued that "the [trial] court erred in not suppressing his statement, 'I killed that girl,' and his identification of the victim as 'Pamela Rimer[,]'" in response to the detective's questions, "Why are we looking for you?" and "What girl?" **Yount**, 314 A.2d at 245.

The **Yount** Court rejected his claim, concluding that the detective's inquiries did not constitute a custodial interrogation, and that Yount's responses were volunteered. The Court reasoned:

[I]t cannot be said that the two police inquiries here challenged constitute conduct calculated to, expected to, or likely to elicit an incriminating response, or that they were asked with an intent to extract or an expectation of eliciting an incriminating statement.

All this record establishes is that the detective knew only that a man named Jon Yount—a name which the detective had never heard before—voluntarily came to the police station early in the morning and volunteered that the police were looking for him. In response to this information, the detective extemporaneously asked, 'Why are we looking for you?' [Yount] was not coerced, prompted, or urged to incriminate himself. To the contrary, the detective's inquiry, made in response to information volunteered by [Yount], was of a neutral character and not interrogative.

[Yount]'s answer, 'I killed that girl,' was given freely and without compelling influence. It was therefore volunteered in the constitutional sense. That the answer was in fact incriminating does not alter its volunteered character nor preclude its use. *Miranda* …, *supra* at 478, 86 S.Ct. at 1630, 16 L.Ed.2d 694.

Similarly, we are of the opinion that the statement identifying 'that girl' as 'Pamela Rimer' was volunteered. [Yount], without any compulsion, went to the substation and volunteered that he had killed 'that girl.' As we indicated in *Commonwealth v. Simala*, … 252 A.2d [575,] 579 n.2 (Pa. 1969), after an incriminating, but ambiguous, statement is volunteered, as was done here, a question which does not do 'anything more than clarify statements already made,' in the absence of any coercion or prompting, subtle or overt, is permissible. *See also* Kamisar, "Custodial Interrogation' Within the Meaning of *Miranda*,' in Institute of Continuing Legal Education, Criminal Law and the Constitution—Sources and Commentaries 335, 354 (1968).

Here, immediately upon hearing [Yount]'s volunteered statement, 'I killed that girl,' the detective spontaneously asked, 'What girl?' By this he sought only to clarify [Yount]'s prior statement. [Yount] responded, 'Pamela Rimer.' Such a clarifying inquiry, made in response to a statement volunteered by [Yount] during an interview which he initiated, is proper. The identification must be deemed constitutionally volunteered.

*Yount*, 314 A.2d at 246.

We do not find *Yount* to be sufficiently analogous to the matter at hand so as to call into question the propriety of the trial court's suppression

order. Yount voluntarily went to a police station and told the police that they were looking for him. When they asked why, he volunteered an inculpatory statement that he had killed a girl. When asked a clarifying question, he identified the victim.

Factually speaking, nothing similar or analogous occurred here, where it is undisputed that Stone was already in custody for *Miranda* purposes long before he offered the suppressed statements. While Stone's statements were not made in the strictest sense as an immediate response to a specific question, we cannot simply ignore the fact that they were made after Stone had already been subject to a custodial detention and interrogation for at least an hour, before Stone was released from that custodial detention, and after Stone had indicated that he wanted a lawyer if he was going to be accused of a crime. Moreover, Wool's searching of Stone's car for evidence, while Stone was still under a custodial detention, itself may be fairly construed as police conduct intended to pressure Stone into making an inculpatory statement, or at least as an inconsequential pause in a custodial interrogation that resumed when the brief search was completed.[4]

_____

[4] Waltman testified that the custodial interrogation continued when Wool returned from searching Stone's vehicle, N.T., 4/25/16, at 44, a fact which was confirmed by Wool during his testimony, *id.* at 50.

As noted above in **Williams**, we must consider the totality of the circumstances in determining whether **Miranda** warnings were necessary, and there is a presumption of involuntariness applied to statements made during a custodial interrogation conducted in the absence of **Miranda** warnings. **Williams**, 941 A.2d at 30. Here, it cannot be fairly said that Stone's incriminating statements were made in the complete "absence of any coercion or prompting, subtle or overt[,]" as was the case in **Yount**. **Yount**, 314 A.2d at 246. To the contrary, Stone's inculpatory statements appear to have stemmed directly from the immediately preceding custodial interrogation, as they were responsive to that interrogation, and were not at all "spontaneous" in the same manner as was at issue in **Yount**. The Commonwealth essentially argues that the custodial interrogation of Stone had ceased when he made the contested statements because Wool had stopped the interview, temporarily, in order to search Stone's car. That fact is only one of many the trial court had to consider in determining whether the failure to provide **Miranda** warnings rendered inadmissible the contested statements. Simply put, the **Yount** decision offers no support for the Commonwealth's claim on appeal.

In *Myers*, the defendant pled guilty to murder generally, requiring a hearing to determine his degree of guilt. At his degree-of-guilt hearing,[5] Myers challenged the admission of an inculpatory statement he made in prison while awaiting trial, and outside the presence of counsel. Myers was approached by a police officer in regard to a matter *unrelated* to his murder trial. *See Myers*, 392 A.2d at 687. After discussing the unrelated matter, "and with no questioning from the officer about the murder, [Myers] asked the officer to identify the informant in the murder case. After the officer responded, [Myers] made the challenged statement." *Id.* Our Supreme Court held that Myers' inculpatory statement was "spontaneously volunteered." *Id.* Moreover, the Court opined, "[w]here … a suspect volunteers a statement without interrogation, there is no danger that police interrogation tactics might have pressured him to forego his right to have counsel present." *Id.* at 688.

We conclude that *Myers* is also inapposite. Here, Stone was not being interrogated about an unrelated matter prior to making the contested statements; his statements were directly related to the preceding interrogation(s) by Wool and Waltman. There is no indication that Myers ever asked to have counsel present (even though he was already

_____

[5] This was Myers' second degree-of-guilt hearing. His initial conviction for first degree murder, and corresponding sentence of death, was overturned on unrelated grounds.

- 13 -

represented by counsel) when he made his spontaneous remarks, whereas here, Stone indicated to Wool that he wanted counsel present if he was being accused of committing a crime. Accordingly, we also disagree with the Commonwealth that the **Myers** decision compels reversal of the suppression order in this case.

The **Simala** case, while also not directly on point, is at least more analogous to the circumstances in this matter. In **Simala**, the victim was killed with a .22 caliber gun. **Simala**, 252 A.2d at 576. Police received a report that Simala had been seen with a .22 caliber revolver on the previous day. Based on that information, the police obtained a search warrant from "Ralph George, who served as mayor and as justice of the peace…." **Id.** When police went to Simala's home to inquire about the gun, Simala told them he had given the weapon to Robert Kline. **Id.** Simala was on juvenile probation, and so police took him into custody, presumably because of his admission that he had previously possessed the firearm. **Id.** However, instead of taking him to a juvenile detention facility, the police took Simala to Mayor George's office, where he sat with Mayor George and two police officers as other officers went to Kline's home. **Id.** "About a half hour after [Simala] was brought to the mayor's office, Mayor George asked him about the gun, and [Simala] told him that he got the gun from a person named Ralph who lived in Johnstown." **Id.**

> That which then ensued is critical to the question of the admissibility of an oral statement made by [Simala]. All three persons testified substantially to the same effect as to what took

- 14 -

place, and [Simala]'s version does not seriously dispute it. The mayor and the two police officers were carrying on a conversation between themselves, and Mayor George looked over toward [Simala], who was 'sitting there with his head down and looked out of this world.' Mayor George said: 'What's the matter, Mike, you look kind of down in the dumps; do you w[ant] to talk? He ([Simala]) said, I want to, but I can't. I said, well, if you want to talk, talk.' At that point [Simala] orally confessed to having killed [the victim]. Mayor George then notified police officers who were in an adjoining room, and thereafter a written statement which was not introduced into evidence was taken from [Simala] after he had been warned of his *Miranda* rights for the first time.

At a pre-trial suppression hearing [Simala] attacked the admissibility of the oral statement given in Mayor George's office, but the court below ruled that the oral confession was not the product of 'custodial interrogation' and that, therefore, it was not necessary to warn [Simala] of his *Miranda* rights before he volunteered the statement.

*Id.* at 576-77.

Our Supreme Court reversed, stating that

this is not a case where [Simala], unencouraged, began to blurt out his confession. Although [Simala] may have been thinking of confessing, something was making him think that he should not, and the first move was made not by him but by the mayor who [u]rged [him] to 'talk.' This should be sufficient to necessitate *Miranda* warnings. Once the mayor said 'you look kind of down in the dumps if you want to talk, talk,' he should have also been obligated to inform [Simala] of the consequences of any statement and of his constitutional right to remain silent and to be assisted by counsel. '(I)t is not simply custody plus 'questioning,' as such, which calls for the *Miranda* safeguards but custody plus police [c]onduct (here the mayor's conduct) calculated to, expected to, or likely to, evoke admissions.'

*Id.* at 578.

Likewise, here, Stone was in custody, and the prior interrogation by Wool and Waltman, coupled with Wool's search of Stone's car for

incriminating evidence, was, by all appearances, police conduct calculated to evoke an admission from Stone. While Stone's contested statements were made shortly after the formal interrogation itself, the delay was not so substantial as to justify a determination that his **Miranda** rights had suddenly evaporated. The delay in the interrogation was brief, Stone had attempted to invoke his right to counsel before making the statements, Wool kept him in custody while the search was conducted, and continued a custodial interrogation when he returned.

Because Stone's statements occurred in the absence of **Miranda** warnings, while he was in custody, and within close temporal proximity to a custodial interrogation that was intended to elicit an inculpatory response, we agree with the trial court that suppression of the contested statements was warranted in the circumstances of this case. In any event, the Commonwealth has simply failed to demonstrate any legal error in the trial court's suppression order. Accordingly, we affirm the trial court's order suppressing Stone's at-issue statements.

Order **affirmed**.

President Judge Gantman joins this memorandum.

President Judge Emeritus Stevens files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/30/2017